880 F.2d 685
 COMPAGNIE des BAUXITES de GUINEE, a Delaware Corporation
v.
ARGONAUT-MIDWEST INSURANCE COMPANY, an Illinois Corporation;
Zurich Insurance Company, a New York Corporation; American
Guarantee and Liability Company, a New York Corporation;
Hammermills Division of Universal Engineering Corporation,
an Iowa Corporation, and Certain Underwriters at Lloyd's, London.
Appeal of COMPAGNIE des BAUXITES de GUINEE, at No. 89-3025.
Appeal of HAMMERMILLS DIVISION OF UNIVERSAL ENGINEERING
CORPORATION, at No. 89-3063.
 Nos. 89-3025, 89-3063.
 United States Court of Appeals,
Third Circuit.
 Argued May 31, 1989.
Decided July 26, 1989.
Rehearing and Rehearing In Banc Denied Aug. 22, 1989.
 
 Andrew M. Roman, Robert W. Doty (argued), Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for Compagnie des Bauxites de Guinee.
 James A. Wood, Israel and Wood, P.C., Pittsburgh, Pa., for Argonaut-Midwest Ins. Co.
 James J. Manley (argued), Burns, Manley & Little, P.C., Pittsburgh, Pa., for Zurich Ins. Co. and American Guarantee and Liability Co.
 Donald W. Bebenek, Louis C. Long, Meyer, Darragh, Buckler, Bebenek & Eck, Pittsburgh, Pa., for Hammermills Div. of Universal Engineering Corp.
 Thomas F. Weis, Weis & Weis, Pittsburgh, Pa., and Thomas F. Lucas (argued), Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for Certain Underwriters at Lloyd's, London.
 Before HIGGINBOTHAM, GREENBERG and HUTCHINSON, Circuit Judges.
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 I.
 
 1
 We are presented with yet another chapter in the continuing saga of insurance litigation involving these parties. Appellants Compagnie des Bauxites de Guinee (CBG) and Hammermills Division of Universal Engineering Corporation (Hammermills) appeal from two orders of the United States District Court for the Western District of Pennsylvania. The first, dated August 31, 1988, inter alia granted summary judgment to three of Hammermills's excess liability insurance carriers after determining that Hammermills failed to give them notice of CBG's claim within a reasonable time. The second, dated December 13, 1988, denied CBG's motion for reconsideration. On appeal, CBG and Hammermills argue that the district court erred in applying Illinois law under Pennsylvania's choice of law rules as set out in Griffith v. United Air Lines, 416 Pa. 1, 203 A.2d 796 (1964). Appellants also argue that the district court erred in holding that the excess liability insurance carriers were not provided with timely notice of CBG's claim by Hammermills. We conclude that the district court was correct in applying Illinois law under Pennsylvania's choice of law rules, as well as in its finding that Hammermills did not provide its excess carriers with timely notice of CBG's claim. We will therefore affirm.
 
 II.
 
 2
 CBG, a Delaware corporation, has its principal place of business in the Republic of Guinea, West Africa, where it operates a bauxite ore processing facility. In 1970, CBG contracted with Hammermills, a subsidiary of Pettibone Corporation (Pettibone),[1] for the purchase of equipment for that facility.[2]
 
 
 3
 In September 1974, one of CBG's facilities sustained structural failure, allegedly as a result of design defects in the equipment supplied by Hammermills. In 1975, CBG filed suit against its own insurance companies, including its primary business interruption insurer, Insurance Company of North America (INA), in the United States District Court for the Western District of Pennsylvania.[3] In May 1977, CBG filed a request for arbitration of its claim for more than $23,000,000 in damages against Hammermills with the International Chamber of Commerce (ICC). Appendix to Brief of Appellant (App.) at 451A. In January 1978, CBG withdrew its arbitration request when it signed an agreement with Hammermills to toll the statute of limitations and preserve the status quo. Id. at 478A. The tolling agreement was renewed annually until May 1985, shortly after the district court awarded judgment for CBG in its business interruption litigation against INA. Armed with that decision, on May 23, 1985, CBG again sought ICC arbitration, this time demanding more than $44,000,000 from Hammermills in damages.[4] Id. at 522A.
 
 
 4
 Pettibone, which obtained insurance coverage for Hammermills and which presented claims on its behalf, did not notify its insurers of CBG's claim until June and July, 1985.[5] Pettibone's primary general liability insurance carrier was Argonaut-Midwest Insurance Company (Argonaut), an Illinois corporation with its principal place of business in Illinois. The first $5,000,000 excess layer of insurance coverage was provided by Zurich Insurance Company and American Guaranty & Liability Company (Zurich-American) and the second $5,000,000 excess layer by Underwriters at Lloyd's, London (Lloyd's). Argonaut and the excess carriers denied coverage based on late notice of claim and policy provisions excluding warranty-type claims.
 
 
 5
 On July 31, 1985, CBG brought the present diversity action under the Declaratory Judgment Act, 28 U.S.C.A. Secs. 2201-2202 (West Supp.1989), seeking a declaration against Hammermills, Argonaut and Zurich-American that its claims against Hammermills are covered by the relevant insurance policies.[6] Argonaut and Zurich-American cross-claimed against Hammermills, asserting, inter alia, that they were under no duty to defend Hammermills against CBG.[7] On May 5, 1986, CBG moved for partial summary judgment against Argonaut. On October 6, 1986, the district court granted CBG's motion for partial summary judgment, holding that, based on the policy's potential coverage of CBG's claims, Argonaut had an initial duty to defend Hammermills in the ICC arbitration proceedings. App. at 31A. The insurers filed motions for summary judgment and on April 20, 1988, CBG filed a motion for partial summary judgment.
 
 
 6
 On August 31, 1988, the district court, applying Illinois law, granted summary judgment for Zurich-American and Lloyd's on the late notice and policy exclusion issues and granted partial summary judgment for CBG against Argonaut on the duty to defend issue. Id. at 171A. The district court denied CBG's motion for reconsideration without opinion on December 13, 1988. Id. at 364A. CBG appealed from the district court's August 31 and December 13, 1988 orders on January 9, 1989. Id. at 366A-1. Hammermills joined in CBG's timely appeal pursuant to Federal Rule of Appellate Procedure 3(b). Id. at 366A-2.
 
 III.
 
 7
 The district court had diversity jurisdiction over this action for declaratory relief pursuant to 28 U.S.C.A. Sec. 1332 (West Supp.1989). We have appellate jurisdiction pursuant to 28 U.S.C.A. Sec. 1291 (West Supp.1989).[8]
 
 
 8
 We view a motion for reconsideration as the "functional equivalent of a Rule 59 motion ... to alter [or] amend a judgment." Venen v. Sweet, 758 F.2d 117, 122 (3d Cir.1985). A timely appeal from the denial of such a motion "brings up the underlying judgment for review." Quality Prefabrication v. Daniel J. Keating Co., 675 F.2d 77, 78 (3d Cir.1982). "Here, it is the underlying summary judgment ... that this court must review." Federal Kemper Ins. Co. v. Rauscher, 807 F.2d 345, 348 (3d Cir.1986). "We must reverse unless it is plain that no genuine issue as to a material fact remains for trial and that the moving party is entitled to summary judgment as a matter of law." Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir.1987). We have plenary review over the summary judgment order. Rauscher, 807 F.2d at 349.
 
 IV.
 
 9
 We must first address the issue of whether Iowa or Illinois law should be applied under Pennsylvania choice of law rules. CBG and Hammermills favor the application of Iowa law, which requires an insurer to show actual prejudice to avoid coverage, even if the insured's delay in giving notice is unexcused. Estate of Wade v. Continental Ins. Co., 514 F.2d 304, 305 (8th Cir.1975). The insurers favor Illinois law, which considers lack of prejudice only as a factor in determining whether late notice was reasonable, if the delay was excused or "relatively brief." Casualty Indem. Exch. v. Village of Crete, 731 F.2d 457, 459 (7th Cir.1984).
 
 
 10
 We must apply the choice of law rules of the forum state, Pennsylvania, to resolve this issue. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); Shuder v. McDonald's Corp., 859 F.2d 266, 269 (3d Cir.1988). The Supreme Court of Pennsylvania has adopted a flexible approach which combines a relationship and interest analysis. Griffith v. United Air Lines, 416 Pa. 1, 203 A.2d 796 (1964).[9] As we have previously described it, the Griffith test "takes into account both the grouping of contacts [listed in the Restatement (Second) of Conflict of Laws Sec. 188(2) (1971) ] with the various concerned jurisdictions and the interests and policies that may be validly asserted by each jurisdiction." Melville v. American Home Assurance Co., 584 F.2d 1306, 1311 (3d Cir.1978). See also Mashuda v. Western Beef, Inc., 527 F.Supp. 887, 891 (W.D.Pa.1981) (Griffith requires analysis of "the significant contacts that the contract has with the various jurisdictions and the interest[s], if any, that the various jurisdictions have in the subject matter of the contract"). Under Griffith, "we must weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [relevant] issue." Shields v. Consolidated Rail Corp., 810 F.2d 397, 400 (3d Cir.1987).
 
 A.
 
 11
 In Griffith, the Supreme Court of Pennsylvania stated: "Contacts considered vital in determining the state of most significant relationship include place of injury, place of conduct, domicil of the parties, and the place where the relationship between the parties is centered." Griffith, 416 Pa. at 15, 203 A.2d at 802-03. The court in Griffith relied on Restatement (Second) of Conflict of Laws Sec. 379 (Tent. Draft No. 9 1964), stating that "torts should be governed by the local law of the state which has the most significant relationship with the occurrence and the parties." Id. at 15, 203 A.2d at 802.[10] Section 188 of the Restatement (Second) of Conflict of Laws, which applies to contract actions and basically tracks Sec. 379, lists the following contacts to be taken into account "[i]n the absence of an effective choice of law by the parties...:"
 
 
 12
 (a) the place of contracting,
 
 
 13
 (b) the place of negotiation of the contract,
 
 
 14
 (c) the place of performance,
 
 
 15
 (d) the location of the subject matter of the contract, and
 
 
 16
 (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
 
 
 17
 These contacts are to be evaluated according to their relative importance with respect to the particular issue.
 
 
 18
 Restatement (Second) of Conflict of Laws Sec. 188(2)(1971).
 
 
 19
 In the case before us, the insurance contracts were negotiated and signed in Illinois and are regulated by Illinois law. The premiums were paid in Illinois, and notice of the claim was issued there. The injury occurred in Africa, while the alleged design defect occurred in Iowa. Pettibone, along with its insurance broker Marsh & McLennan Agency, Inc. (Marsh & McLennan), are Illinois corporations with their principal place of business in Illinois. At the time of the injury, Hammermills was a Missouri corporation with its principal place of business in Iowa. In 1984, it became a division of Universal, another Pettibone subsidiary. It is now an Iowa corporation with its principal place of business in Iowa. CBG is a Delaware corporation with its principal place of business in the Republic of Guinea, Africa.
 
 
 20
 Argonaut is an Illinois corporation with its principal place of business in Illinois. Zurich-American is a Swiss corporation, also with its principal place of business in Illinois. Lloyd's is also a foreign entity, but uses Marsh & McLennan as its American agent. The policies issued by Lloyd's in this case are regulated by Illinois law.[11]
 
 
 21
 CBG and Hammermills chiefly rely on Restatement (Second) of Conflict of Laws Sec. 193, which states:
 
 
 22
 The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship ... to the transaction and the parties, in which event the local law of the other state will be applied.
 
 
 23
 Restatement (Second) of Conflict of Laws Sec. 193 (1971). By its terms, however, Sec. 193 is limited to cases in which there is an understanding among the parties as to the location of the insured risk. We have not been directed to any evidence of such an understanding. CBG and Hammermills also rely on comment b to Sec. 193, which provides that "[t]he location of the insured risk will be given greater weight than any other single contact in determining the state of the applicable law provided that the risk can be located, at least principally, in a single state." Id. at Sec. 193 comment b. However, comment b further explains that the location of the insured risk has less significance "where the policy covers a group of risks that are scattered throughout two or more states." Id. The equipment Hammermills manufactures is distributed throughout the world. In this case, while the alleged design defect occurred in Iowa,[12] the risk of loss associated with the design defect travelled with the equipment to its final destination, in this case Africa. The difficulty in defining, or even locating, the insured risk and the lack of an understanding among the parties as to its location combine to greatly diminish the importance of this factor.
 
 
 24
 Griffith, as well as Restatement Sec. 188, to which we now turn, require us to weigh the importance of individual contacts in relation to the particular issue involved. Here, the issue is notice of claim. As to that issue, location of the insured risk is further diminished in importance while factors like the location of the injury, the domicile of the parties, and the location of contracting and negotiation become relatively more important. In Sandefer Oil & Gas, Inc. v. AIG Oil Rig of Texas Inc., 846 F.2d 319 (5th Cir.1988), which involved issues identical to those before us, the United States Court of Appeals for the Fifth Circuit observed that "[i]t is not clear that the insured risk in this case has a 'principal location' within the meaning of section 193." Id. at 324. The court held that Sec. 193 was inapplicable because "the insured risk was located in various state[s]." Id. In such a situation, " '[t]he law governing insurance contracts of this ... sort must be determined in accordance with the principles set forth in Sec. 188.' " Id. (quoting Restatement (Second) of Conflict of Laws Sec. 193 comment a). We think this same approach is appropriate in the case before us. Therefore, we must look at the full spectrum of relevant relationships between each jurisdiction and the insurance policies. The district court correctly rejected narrow application of Sec. 193 in favor of the more flexible Griffith analysis.
 
 
 25
 As the Fifth Circuit recognized, "[t]he place of contracting, negotiation, and performance are the most relevant contacts with respect to the notice procedures." Id. at 324. Here, the contracts were negotiated and signed in Illinois and are regulated by Illinois law. Under the contracts, Hammermills had to notify its parent, Pettibone. Pettibone negotiated the insurance contracts in Illinois through Marsh & McLennan. Pettibone is an Illinois corporation with its principal place of business in Illinois. Pettibone processed the claim and ultimately directed Marsh & McLennan, also incorporated and principally operating in Illinois, to notify the insurers. Thus, although Hammermills may have been a separate entity for coverage purposes, it had nothing to do with presenting the claim or notice of the claim to the insurers.[13] Evaluating the contacts "according to their relative importance with respect to the particular issue," Restatement (Second) of Conflict of Laws Sec. 188(2), we conclude that Illinois has the most significant relationship to the contracts at issue in this case.
 
 B.
 
 26
 The second part of the Griffith analysis concerns "the interests and policies that may be validly asserted by each jurisdiction." Melville, 584 F.2d at 1311. The district court identified Iowa's interest as "protecting its residents from forfeitures" and Illinois's interest as "seeing that the insurance policies which it regulates are adhered to by both insurers and insureds." App. at 175A.[14] It held that the latter was more significant. Id. at 175A-76A. The district court discounted Iowa's interest by noting that "Hammermills is no longer in Iowa." Id. at 176A. Hammermills, as a Missouri corporation operating in Iowa, was indeed dissolved in 1984 but its assets, product lines, operations, and employees were transferred to Universal, another Pettibone subsidiary, when it became the Hammermills Division of Universal Engineering Corporation. In that form, Hammermills does in fact continue to operate in Iowa and is a division of a Pettibone subsidiary rather than a Pettibone subsidiary itself.
 
 
 27
 Nevertheless, we conclude that Illinois has the more significant interest in the subject matter involved here. While Iowa has a public policy against forfeiture, it asserts no regulatory oversight over the relevant policies. The injured party is not a resident of Iowa; instead, CBG is a Delaware corporation with principal place of business in the Republic of Guinea, West Africa. The policies containing the notice provisions, the party who must give the notice, and the party to whom the notice must be given are all subject to Illinois's regulatory authority. Hammermills and its parent, Pettibone, were in bankruptcy proceedings and CBG, which does not reside or do business in Iowa, has been designated the assignee of any insurance proceeds. These factors undercut the significance of Iowa's interest in this case. Since notice of claim is the issue, we find that they outweigh Iowa's general public policy against forfeiture.
 
 
 28
 Applying the Griffith analysis, then, we find that Illinois's contacts and interests outweigh those of Iowa. Therefore, we hold that the issue of whether the insurers received timely notice of CBG's claim should be analyzed under Illinois law.
 
 V.
 
 29
 Having decided that Illinois law applies, we turn to the merits. Zurich-American's policy contains a notice provision which states:
 
 
 30
 Notice of occurrence--
 
 
 31
 Whenever the insured has information from which the insured may reasonably conclude that an occurrence covered hereunder involves injuries or damages which, in the event that the insured should be held liable, is likely to involve this policy, notice shall be sent to the company as soon as practicable, provided, however, that failure to give notice of any occurrence which at the time of its happening did not appear to involve this policy but which, at a later date, would appear to give rise to claims hereunder, shall not prejudice such claims.
 
 
 32
 App. at 407A. The Lloyd's policy contains virtually identical language. Id. at 434A.[15]
 
 
 33
 Under its established procedures for handling claims, Pettibone's legal department did not send CBG's 1977 claim to its treasury department for notification to the insurers because its general counsel concluded that the claim was not covered by the policies in question. General counsel did not consult either Pettibone's insurance department or any party outside the company regarding the nature of the claim. However, following the district court decision for CBG in the INA litigation, Pettibone did send CBG's identical 1985 claim for notification, insisting that it was covered by those very same policies. The district court concluded that the 1977 claim triggered a duty to notify the excess insurers, since the amount of damages sought would have involved the excess layer of insurance and CBG's request for arbitration set forth the same claim that it now makes in this action. Id. at 180A. The district court also found that the insured failed to exercise due diligence in determining whether CBG's claim was covered under the insurance policies and, therefore, whether to notify the insurers.[16] Id. at 182A.
 
 
 34
 In Brownlee v. Western Chain Co., 74 Ill.App.3d 804, 30 Ill.Dec. 479, 393 N.E.2d 515 (1979), an excess insurer provided coverage under a policy containing a notice provision identical to that in the present case. The insured received a summons and complaint with insufficient information to determine "the likeliness of excess liability." Id. at 812, 30 Ill.Dec. at 484, 393 N.E.2d at 520. The Appellate Court of Illinois concluded that because the summons was insufficient to raise the possibility of excess liability, the insured had no duty to inform the insurer under the policy's notice provision, since he had no knowledge or information that the excess liability would be implicated. In the present case, the 1977 arbitration claim clearly contained such information and the insured clearly had such knowledge.[17]
 
 
 35
 Under Illinois law, "the time within which notice is required is determined by a standard of reasonableness, based upon the facts and circumstances of a particular case." Fletcher v. Palos Community Consol. School Dist. No. 118, 164 Ill.App.3d 921, 926, 115 Ill.Dec. 838, 842, 518 N.E.2d 363, 367 (1987). This standard requires the exercise of due diligence by the insured in notifying the insurer. Sisters of Divine Providence v. Interstate Fire & Casualty Co., 117 Ill.App.3d 158, 162, 72 Ill.Dec. 731, 734, 453 N.E.2d 36, 39 (1983). As do the express terms of the Zurich-American and Lloyd's policies, this standard also requires the insured to provide notice "as soon as it [is] practicable for him to do so." McFarlane v. Merit Ins. Co., 58 Ill.App.3d 616, 619, 16 Ill.Dec. 176, 178, 374 N.E.2d 951, 953 (1978). Whether the insured acted reasonably in believing that an occurrence was not covered and, therefore, in not giving notice is usually a question of fact for the jury. See Farmers Auto Ins. Ass'n v. Hamilton, 64 Ill.2d 138, 142, 355 N.E.2d 1, 3 (1976). However, "if there are no disputed material facts, the trial court may in appropriate circumstances decide the issue of reasonable notice as a matter of law." Fletcher, 164 Ill.App.3d at 926, 115 Ill.Dec. at 842, 518 N.E.2d at 367. When an insured has "failed to give timely notice and to offer any reasonable excuse for delay," a court may grant summary judgment. United States Fidelity & Guar. Co. v. Maren Eng'g Corp., 82 Ill.App.3d 894, 899, 38 Ill.Dec. 277, 281, 403 N.E.2d 508, 512 (1980).
 
 
 36
 In Maren, the court found a two year delay between the insured's receipt of information about an accident involving one of its products and notification of its insurers unreasonable. The insured only sent notification after receiving a summons and complaint. Id. at 898, 38 Ill.Dec. at 280, 403 N.E.2d at 511. It failed to conduct any follow-up inquiry during that two year period. Id. The Appellate Court of Illinois affirmed the trial court's award of summary judgment to the insurer, finding that the insured's knowledge that "a lawsuit might ensue" undercut its argument that it reasonably believed the claim in that case was not covered. Id. The court determined:
 
 
 37
 [T]he fact that the information was not forwarded to the corporate officer in charge of such matters nor was there additional inquiry until the summons and complaint were received, demonstrates that [the insured] failed to use due diligence in determining whether they were thereafter liable and thereafter notifying [the insurer] of the accident.
 
 
 38
 Id. at 899, 38 Ill.Dec. at 280, 403 N.E.2d at 511. The present case presents a similar situation. The general counsel neither forwarded any information to the insurance risk manager nor made any inquiries, either within or outside the company, until after CBG received a favorable judgment in the INA litigation and renewed its arbitration request in 1985.
 
 
 39
 We have held that a notice provision identical to that in the Zurich-American and Lloyd's policies does indeed impose an objective standard of reasonableness on the insured. Trustees of the Univ. of Pa. v. Lexington Ins. Co., 815 F.2d 890, 896 (3d Cir.1987) (applying Pennsylvania law). Under Illinois law, "the key element of the requirement to notify [is] the appearance to a reasonably prudent person that a claim covered by the policy may be brought against the insured and not the appearance that the insured, in fact, may be liable." National Bank v. Winstead Excavating, 94 Ill.App.3d 839, 842, 50 Ill.Dec. 414, 416, 419 N.E.2d 522, 524 (1981).
 
 
 40
 Under the facts and circumstances of this case, which include a 1977 claim for more than $23,000,000 in damages and involve extended litigation against the business interruption insurance carriers concerning the occurrence for which coverage is claimed, an eight year delay until 1985 in notifying the excess liability insurance carriers was unreasonable.
 
 VI.
 
 41
 Applying Illinois law, we conclude that the insured failed to give timely notice to its insurers and that the district court properly granted summary judgment to Zurich-American and Lloyd's. Therefore, we will affirm the orders of the district court.
 
 
 
 [1]
 Pettibone is an Illinois corporation with its principal place of business in Illinois
 
 
 [2]
 At that time, Hammermills was a Missouri corporation with its principal place of business in Iowa. After its dissolution in 1984, it became the Hammermills Division of Universal Engineering Corporation (Universal). Universal is also a Pettibone subsidiary. Hammermills is currently an Iowa corporation with its principal place of business in Iowa
 
 
 [3]
 The litigation by CBG against INA and its twenty-one excess business interruption insurers produced three opinions by this Court. See Compagnie des Bauxites de Guinea v. Insurance Co. of N. Am., 651 F.2d 877 (3d Cir.1981), aff'd sub nom. Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 102 S.Ct. 2099, 72 L.Ed.2d 492 and cert. denied, 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1312 (1982); Compagnie des Bauxites de Guinee v. Insurance Co. of N. Am., 724 F.2d 369 (3d Cir.1983); Compagnie des Bauxites de Guinee v. Insurance Co. of N. Am., 794 F.2d 871 (3d Cir.1986). INA has asserted subrogation interests in CBG's claim against Hammermills in the present litigation. Appendix to Brief of Appellant (App.) at 255A
 
 
 [4]
 Hearings in this matter were conducted in July and August of 1988. A final decision has not yet been reached. Brief for Appellant CBG at 3-4
 
 
 [5]
 Hammermills and CBG allege on appeal that Pettibone's standard procedure in handling claims was for its general counsel to distinguish between "warranty" and "products" claims. "Warranty claims," or customer complaints about the performance of equipment sold by the company, were handled by the legal department and never sent to the insurance risk manager. "Products claims," or third party liability claims, were sent to Pettibone's insurance risk manager and insurance broker for notice to the insurers. Pettibone's general counsel in 1977, Paul Carrier, believed that CBG's claim was of the warranty type and, therefore, not covered by the relevant insurance policies. He did not notify the insurers of the claim. Pettibone's general counsel in 1985, Eric Schaal, did notify the insurers of CBG's claim when CBG renewed its arbitration request. See Brief for Appellant CBG at 6-9
 On January 31, 1986, Pettibone filed for bankruptcy and CBG filed a formal proof of claim for any award rendered in the ICC arbitration. By order dated March 25, 1988, the bankruptcy court approved a settlement agreement assigning Pettibone's rights under the insurance policies at issue here to CBG. App. at 592A.
 
 
 [6]
 The district court granted Lloyd's motion to intervene pursuant to Federal Rule of Civil Procedure 24 on October 1, 1987
 
 
 [7]
 The appendix also contains a cross-claim by Lloyd's against Hammermills, asserting the same. App. at 65A. This cross-claim is not listed on the docket sheet
 
 
 [8]
 We note that the district court's August 31 order granting summary judgment to three of the four defendants did not, by itself, constitute a final judgment for purposes of section 1291. However, on May 9, 1989, the district court granted the parties' joint motion to expressly designate the August 31 order as final under Federal Rule of Civil Procedure 54(b). We therefore have appellate jurisdiction pursuant to section 1291, even though the certification was made after an appeal was filed in this Court. See Cape May Greene, Inc. v. Warren, 698 F.2d 179, 185 (3d Cir.1983) ("[Rule] 54(b) certification filed after a notice of appeal ha[s] been docketed [is] adequate to confer appellate jurisdiction")
 
 
 [9]
 Although Griffith involved a tort action, its analysis has been applied in contract cases. See, e.g., American Contract Bridge League v. Nationwide Mut. Fire Ins. Co., 752 F.2d 71, 74 (3d Cir.1985); Melville v. American Home Assurance Co., 584 F.2d 1306, 1311 (3d Cir.1978)
 
 
 [10]
 Section 379 of Tentative Draft No. 9 became Sec. 145 in the adopted final draft
 
 
 [11]
 The insurers state that "[n]either of Pettibone's subsidiaries [Hammermills or Universal] were specifically identified in the policies. Coverage would be provided to [them] based upon their status as companies 'owned or controlled' by Pettibone." Brief for Appellees at 3. However, the Argonaut policy names as insureds "Pettibone Corporation and/or any subsidiary, or owned or controlled companies as now or hereafter constituted." App. at 376A. The Zurich-American policy likewise names as insureds "Pettibone Corporation and any subsidiary, associated, affiliated companies and owned or controlled companies as now or hereafter constituted." Id. at 397A. The Lloyd's policy names as insureds Pettibone "and/or subsidiary, associated, affiliated companies or owned and controlled companies as now or hereafter constituted." Id. at 433A. CBG is correct when it states that "Hammermills and Universal ... are named insureds under the contract." Brief for Appellant CBG at 15
 
 
 [12]
 The district court indeed stated that "[t]he alleged design defect occurred in Iowa, where Hammermills designed and manufactured the equipment pursuant to its contract with CBG." App. at 174A. CBG asserts, on the basis of this statement, that "the district court recognized that Iowa was the location of the risk for purposes of Section 193." Reply Brief for Appellant CBG at 4. However, the district court did not address the location of the risk issue, choosing the more comprehensive relationship analysis under Griffith rather than exclusive application of section 193, which it dismissed as a " 'wooden application of a few overly simple rules.' " App. at 175A (quoting Griffith, 416 Pa. at 13, 203 A.2d at 801)
 
 
 [13]
 The district court treated Pettibone and Hammermills interchangeably for purposes of the duty to give reasonable notice to the insurers. See App. at 179A-82A. Although Pettibone was responsible for providing notice to the insurers, the district court and the parties referred to Hammermills as the responsible party
 
 
 [14]
 CBG cites Lane v. Crescent Beach Lodge & Resort, Inc., 199 N.W.2d 78 (Iowa 1972), to support its contention that "Iowa has a strong interest in protecting its residents from forfeitures." Brief for Appellant CBG at 18. That case involved an alleged forfeiture of an installment purchase contract for property based on the buyer's failure to pay insurance premiums. The court held, inter alia, that this failure to pay the premiums did not constitute a default on the contract justifying forfeiture. Lane, 199 N.W.2d at 82. CBG does not indicate why this rule should be applied in the present case, which involves a different issue
 
 
 [15]
 We agree with the district court that these policies do not condition notice on knowledge of the occurrence by Pettibone's treasurer's office, as does the primary Argonaut policy. See App. at 387A. This policy language, as well as the fact that CBG's 1977 claim of $23,000,000 would obviously involve the excess insurance layers, lead us to reject appellants' argument that the duty to notify the excess carriers did not exist until the primary carrier was notified. As the district court simply put it, "[w]hile it is unusual that an insured is required to notify an excess carrier before the primary insurer, in this instance, the insured agreed to the procedure under the terms of the various policies." App. at 179A-80A
 
 
 [16]
 CBG's and Hammermills's argument that lack of prejudice should be considered is without merit. Under Illinois law, lack of prejudice is a factor only when the insured has a good excuse for the delay. See Casualty Indem. Exch. v. Village of Crete, 731 F.2d 457, 459 (7th Cir.1984). We agree with the district court that, since the insured here had no legally acceptable excuse for the delay, lack of prejudice should not be considered. "[A]n insured's lack of diligence is not overlooked merely because the insurer has failed to show actual prejudice due to the delay." McFarlane v. Merit Ins. Co., 58 Ill.App.3d 616, 619, 16 Ill.Dec. 176, 178, 374 N.E.2d 951, 953 (1978). "Thus, the issue in a case involving late notice is not whether the insurer has been prejudiced, but rather, whether reasonable notice has been given." United States Fidelity & Guar. Co. v. Maren Eng'g Corp., 82 Ill.App.3d 894, 898, 38 Ill.Dec. 277, 280, 403 N.E.2d 508, 511 (1980)
 
 
 [17]
 The fact that CBG withdrew its initial request for ICC arbitration does not show that CBG did not intend to file a claim. Indeed, the tolling agreement between CBG and Pettibone served to preserve CBG's rights to pursue any such claim and expressly provided that CBG could reinstate its arbitration request at any time within one year. The parties renewed the tolling agreement annually until 1985. This belies Hammermill's asserted belief that no claim would ever be filed